**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Cynthia Soto-González on behalf of her minor daughter AMS, Plaintiff, v. Drs' Center Hospital, et al, Defendants | **Civil. No. 20-cv-0431(GMM)** |

## <u>OPINION AND ORDER</u>

Pending before the Court are the *Motion in Limine Requesting the Exclusion or Limitation of the Opinions and/or Testimony to be Provided by Dr. Allan Hausknecht* ("*Motion to Exclude Dr. Hausknecht*") and the *Motion in Limine to Exclude the Opinions and Testimony of Dr. Joseph Carfi* ("*Motion to Exclude Dr. Carfi*") (collectively "*Motions in Limine*") filed by Doctors' Center Hospital Manatí, Inc. ("Doctors Center"), Dr. Ralph Díaz-Colon ("Dr. Díaz-Colón") and Dr. Luis Acosta-Montijo ("Dr. Acosta-Montijo") (collectively "Defendants"). (Docket Nos. 121 and 122). Also, before the Court is Defendants' *Supplement to Motion In Limine filed at D.E. 122 & Motion to Strike Plaintiff's Belated Disclosures Pursuant to FRCP 26(E) & FRCP 26(A)(3)(B)* ("*Supplement to Motion in Limine*"). (Docket No. 137).

Civil. No. 20-cv-01431(GMM)
Page -2-

# I.   PROCEDURAL BACKGROUND

On August 20, 2020, Plaintiff Cynthia Soto-González ("Plaintiff" or "Ms. Soto-González") filed a Complaint on behalf of her minor daughter AMS against Doctors Center, Dr. Díaz-Colón and Dr. Acosta-Montijo, alleging medical malpractice. (Docket No. 1). Specifically, Plaintiff alleges that the Defendants' failure to prevent, treat, and properly diagnose AMS's condition after birth — detection of high bilirubin levels and related tests — caused AMS to suffer catastrophic injuries including severe brain damage and physical abnormalities that are permanent and incapacitating. (Id.).

As per the Case Management Order issued on January 13, 2021, the deadline for the conclusion of discovery, including the presentation of factual and expert witnesses, was set for July 13, 2021. (Docket No. 27). On April 29, 2021, the Court extended the conclusion of discovery to October 15, 2021. (Docket No. 31).

Plaintiff retained Dr. Allan Hausknecht ("Dr. Hausknecht") as their expert witness in neurology and general medicine and proffered that he would testify as to "the departures from the medical standards by defendants in the treatment provided to AMS and their causal relationship with her damages, and about any applicable medical literature in support of his opinion." (Docket No. 116 at 54). Plaintiff also informed that Dr. Hausknecht "may also testify about his expert report and the reports that may be

rendered by any other expert in this case." (Id.). In addition, Plaintiff also retained Dr. Joseph Carfi ("Dr. Carfi") as a medical expert in physical medicine and rehabilitation, electrodiagnosis, life care planning, and general medicine. Plaintiff proffered that Dr. Carfi would testify as to "the departures from the medical standards by defendants in the treatment provided to AMS and their causal relationship with her damages, and about any applicable medical literature in support of his opinion." (Id.).

On June 1, 2023, the Court set the jury trial in this case to be held from February 26, 2024 to March 5, 2024. (Docket No. 107). On August 28, 2023, parties filed a *Supplemental Joint Proposed Pretrial Order*. (Docket No. 116). In anticipation of trial, on February 1, 2024, the Court set February 9, 2024 as the date by which any motions *in limine* must be filed. (Docket No. 118).

Accordingly, on February 9, 2020, Doctors Center filed two Motions *in Limine*: *Motion to Exclude Dr. Hausknecht* and *Motion to Exclude Dr. Carfi*. (Docket Nos. 121 and 122). On February 12, 2024, both Dr. Díaz-Colón and Dr. Acosta-Montijo filed *Motions for Joinder under Rule 10(c) of the Federal Rules of Civil Procedure* requesting to join the Motions *in Limine* filed by Doctors Center. (Docket Nos. 124-127). On the same date, the Court allowed the request. (Docket Nos. 130-133). The Court also ordered Plaintiff to respond to the Motions *in Limine* by February 20, 2024. (Docket Nos. 128 and 129). On February 20, 2024, Plaintiff filed

Civil. No. 20-cv-01431(GMM)
Page -4-

*Plaintiff's Omnibus Opposition to Codefendant's Motions In Limine.* (Docket No. 151).

On February 17, 2024, Doctors Center filed a *Supplement to Motion in Limine.* (Docket No. 137). Therein, they argue that on February 12, 2024, Plaintiff submitted an update to Dr. Carfi's report, and that such supplementation should be stricken since it was untimely. Both Dr. Díaz-Colón and Dr. Acosta-Montijo filed *Motions for Joinder under Rule 10(c) of the Federal Rules of Civil Procedure* requesting to join the *Supplement to Motion in Limine.* (Docket Nos. 140 and 146). On February 20, 2024, the Court granted the motion. (Docket No. 148). On February, 22, 2024, Plaintiff filed her *Opposition to Supplement to Motion in Limine and Motion to Strike* arguing that Defendants have incorrectly characterized a "note to file" as an "updated report." (Docket No. 153at 6). Plaintiff further alleges that this "note to file" proffers no new theory or evidence and is "merely adding new information that was not available at the time of his initial report." (Id. at 9).

On February 22, 2024, Doctors Center filed a *Reply to Plaintiff's Omnibus Opposition to DCHM's Motions in Limine.* (Docket No. 157).

A.   Motion to Exclude Dr. Hausknecht

Defendants move to preclude Dr. Hausknecht from testifying as an expert witness pursuant to Federal Rules of Evidence 403 and 702 ("Rule 403" and "Rule 702"). (Docket No. 121). Defendants

contend that Dr. Hausknecht's report states that the Defendants deviated from the applicable standard of care in their treatment of AMS. (Id. at 5). Yet, Dr. Hausknecht's report fails to identify the specific standard of care to which he is referring, and/or how that standard was breached by each of the Defendants *i.e.* the hospital and two physicians. (Id.). In addition, Defendants argue that Dr. Hausknecht opines that AMS suffers from "neurologically detailed damages," yet his report does not discuss the specific clinical findings in AMS's medical records that support this conclusion. Moreover, Dr. Hausknecht acknowledges that he has not reviewed an EEG, Brain CT Scan, or Brain MRI to confirm such finding. Defendants further allege that Dr. Hausknecht does not discuss in his report how each of the defendants, who treated AMS at different times and stages of her hospitalization and re-admission to DCHM, caused and/or contributed to her condition. (Id.). Hence, Defendants conclude that Dr. Hausknecht's report and proffered testimony do not comply with the reliability and methodology requirements of Rule 702. (Id. at 10).

In response, Plaintiff argues that Dr. Hausknecht has more than adequately identified sufficient departures from standards of care to allow his testimony and that any perception as to deficiency in specificity would go to the weight of the evidence. (Docket No. 151 at 15). Particularly, Plaintiff contends that Dr. Hausknecht is allowed to rely on the opinion rendered by the other

expert witness in this case, Dr. Carolyn S. Crawford ("Dr. Crawford"). Further, Plaintiff argues that Dr. Hausknecht did not need "some sort of neurological confirmation before rendering his opinion." (Id. at 17).

B.    Motion to Exclude Dr. Carfi

Defendants also move to preclude the expert testimony of Dr. Carfi. (Docket No. 122). Defendants argue that pursuant to Federal Civil Rule 26(a)(2)(B) and Rules 403 and 702, the testimony of the expert witness in life care planning should be excluded because he used methodology that did not comport with the legal requirements for an expert witness; he failed to quantify the total life care costs under either of the scenarios he allegedly considered for AMS's future care; he failed to establish or state the life expectancy of AMS; and he proffered testimony that was far more prejudicial than probative. (Id.). Defendants further contend that the expansive scope of Dr. Carfi's proffered testimony, which includes testifying about the applicable standard of care and how it was breached in this case, is diametrically opposed to the actual content and substance of his expert report. This is to say, Dr. Carfi's report does not state or reference any applicable medical standards nor how the applicable standards were specifically breached by Defendants. Furthermore, Defendants allege that Dr. Carfi's report is also lacking in references or citations to medical literature and that there is no discussion as

Civil. No. 20-cv-01431(GMM)
Page -7-

to how the unidentified medical literature is linked to and/or supportive of his opinions. (Id. at 8).

In response, Plaintiff states that Dr. Carfi won't be testifying about medical standards of care, breach of said standards, or causation. (Docket No. 151 at 19). Rather, he will be testifying about his report and life care plan. (Id.). Plaintiff also argues that Dr. Carfi provided a medical recommendation for the services, equipment, and/or treatment that he claims AMS will require by identifying multiple sources of medical recommendations that have been made by AMS's treating physicians. (Id.). In addition, Plaintiff acknowledges that, although Dr. Carfi is qualified to do so, his life care plan does not estimate AMS's life expectancy. However, she argues this is no reason to exclude the report or his testimony as there is no legal requirement to that extent. (Id. at 22).

## II.  LEGAL STANDARD

A.  Medical Malpractice Prima Facie Case

To establish a "prima facie case" of negligence under Puerto Rico Law title 31, Section 5141, the plaintiffs must establish: "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d 184, 189 (1st

Civil. No. 20-cv-01431(GMM)
Page -8-

Cir. 1997). With respect to a negligence claim that alleges medical malpractice, "Puerto Rico holds health care professionals to a national standard of care." Id. at 190. In addition, for such claims, "Puerto Rico law presumes that physicians exercise" the reasonable level of care. Id. The plaintiffs "bear[ ] the burden of refuting this presumption." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993). Thus, "a plaintiff bent on establishing a breach of a physician's duty of care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Cortés-Irizarry, 111 F.3d at 190.

Notably, "experts must prove that a standard of care is nationally used, rather than simply explaining a standard as based on their experience." Santa Cruz-Bacardi v. Metro Pavia Hosp., Inc., 2019 WL 3403367, at *5. This can be achieved by referencing "a published standard, [discussion] of the described course of treatment with practitioners outside the District. . .at seminars or conventions, or through presentation of relevant data." Strickland v. Pinder, 899 A.2d 770, 773-74 (D.C. 2006) (internal citations omitted).

B.   Rule 702: The Admissibility of Expert Witness

Rule 702 governs the admissibility of expert witness testimony. Specifically, Rule 702 establishes that:

Civil. No. 20-cv-01431(GMM)
Page -9-

    (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Accordingly, as established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 469 (1993), Federal Rule of Evidence 702 assigns a "gatekeeping role for the judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Therefore, when assessing the reliability of expert testimony, trial courts can consider the following factors discussed in Daubert: (1) whether the expert's theory or technique is generally accepted as reliable in the scientific community; (2) whether the theory or technique in question can be, and has been, tested; (3) whether the theory or technique has been subjected to peer review and publication; and (4) the known or potential rate of error of the theory or technique. *See* Daubert, 509 U.S. at 588-594.

Consequently, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence

Case 3:20-cv-01431-GMM   Document 176   Filed 02/23/24   Page 10 of 29

Civil. No. 20-cv-01431(GMM)
Page -10-

that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). As part of their gatekeeping function, judges must focus "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. In other words, under Daubert, an expert cannot merely state their qualifications, conclusions, and assurances of reliability. *See* Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995). "Moreover, if a witness is relying mainly on experience, he must provide more information for the Court to determine the reliability of his testimony." Santa Cruz-Bacardi v. Metro Pavia Hosp., Inc., 2019 WL 3403367, at *2 (D.P.R. 2019); *see also* Rodriguez v. Hosp. San Cristobal, Inc., 91 F.4th 59, 72 (1st Cir. 2024).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 US at 595. "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Lopez-Ramirez v. Toledo-Gonzalez, 32 F.4th 87, 94 (1st Cir. 2022) (*quoting* Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011)) (internal quotations omitted). In this

regard, "trial judges may evaluate data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Milward, 639 F.3d at 15 (*quoting* Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998)).

The Court notes the difference between an "unreliable" support and an "insufficient" support for an expert witness' conclusion. *See* Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022) (*quoting* Milward, 639 F.3d at 22). Whether the underpinning of an expert's opinion is insufficient is "a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury." Id. (*quoting* Milward, 639 F.3d at 22). To that extent, "[t]he proponent of expert testimony has the burden to show by a preponderance of the evidence it is reliable, not that it is correct." Robertson v. Iberia Comprehensive Community Health Center, Inc., Case No. 6:17-CV-01663, 2022 WL 4479204, at *2 (W.D. La. Sept. 26, 2022) (*citing* Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012)).

Therefore, to ensure reliability and intellectual rigor, experts "must be able to produce a written report or testimony supported by an accepted methodology that is based on substantial scientific, technical, or other specialized knowledge." Figueroa v. Simplicity Plan de Puerto Rico, 267 F.Supp.2d 161, 164 (D.P.R. 2003). "Failure to provide a testimony or a report detailing the

Civil. No. 20-cv-01431(GMM)
Page -12-

basis for the expert's opinion in a comprehensive scientific manner can cause the expert witness and his report to be eliminated from trial." Id. (*citing* Justo Arenas & Carol M. Romey, *Professional Judgment Standard and Losing Games for Psychology, Experts and the Courts*, 68 Rev. Jur. U.P.R. 159, 180 (1999)).

C.    Federal Civil Rule 26

    1.    Expert Report Requirements

    Rule 26 requires that a party seeking to admit expert witness testimony must submit "a written report" that "must contain:"

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

    The Rule 26 (a)(2)(B) requirements clearly "call for parties to make explicit and detailed expert disclosures." Santiago-Díaz v. Laboratorio Clinico Y De Referencia Del Este And Sara Lopez, M.D., 456 F.3d 272, 276 (1st Cir. 2006). Therefore, "expert-related

Civil. No. 20-cv-01431(GMM)
Page -13-

disclosures are insufficient when they consist of 'sketchy and vague descriptions of anticipated opinions or areas of anticipated testimony.'" Rivera-Marrero v. Presbyterian Cmty. Hosp., 255 F. Supp. 3d 290, 296–97 (D.P.R. 2017) (*quoting* Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546 (5th Cir. 1996)); *see also* Romero v. Drummond Co., Inc., 552 F.3d 1303 (11th Cir. 2008) (finding that the District Court did not abuse its discretion when excluding experts whose reports consisted of single paragraphs that merely recited the general subject matter of their expected testimony and lacked any of the substance required by Rule 26(a)(2)(B)).

   2.  Duty to Supplement

   Rule 26 requires each party to supplement or correct its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(3)(1)(A). In the event of an untimely disclosure, the movant "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

   Regarding expert reports, Fed. R. Civ. P. 26(e)(2) dictates that parties have a duty to supplement an expert's report by the time pretrial disclosures are due. The duty also applies to "[c]hanges in the opinions expressed by the expert whether in the

report or at a subsequent deposition." Fed. R. Civ. P. 26(a),
advisory committee's notes.

Accordingly, when a party fails to provide the information
required by Rule 26(a) or (e), Fed. R. Civ. P. 37(c)(1) "authorizes
the trial court to impose sanctions, up to and including dismissal
of the action on account of a party's failure to comply with these
automatic disclosure obligations." Aponte-Davila v. Municipality
of Caguas, 2017 WL 3025896, at *1 (D.P.R. 2017). The First Circuit
has further established that "[t]he baseline rule is that the
required sanction. . .is mandatory preclusion." Santiago-Díaz, 456
F.3d at 276 (internal quotations omitted). However, while
mandatory preclusion might be the norm, District Courts have
discretion in selecting the appropriate sanction and preclusion is
not automatic. Id. Moreover, "in the absence of harm to a party,
a district court may not invoke the severe exclusionary penalty
provided for by Rule 37(c)(1). This is especially so when, as was
the case here, the exclusion would result in the dismissal of the
plaintiffs' case." Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 613
F.3d 54, 58 n. 1 (1st Cir. 2010); see also Wegener v. Johnson, 527
F.3d 687, 692 (8th Cir. 2008) ("When fashioning a remedy, the
district court should consider, inter alia, the reason for
noncompliance, the surprise and prejudice to the opposing party,
the extent to which allowing the information or testimony would

disrupt the order and efficiency of the trial, and the importance of the information or testimony.").

In addition, in medical malpractice cases, plaintiffs must submit an expert report including "all of the opinions that the expert will express at trial and the reasons for them." Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 77 (1st Cir. 2009); *see also* Gonzalez Rivera v. Hospital HIMA-Caguas, 2018 WL 4676925, at *3 (D.P.R. 2018). Thus, an expert's report must be detailed, complete, and "include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor." Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741 n. 6 (D.P.R. 1998) (internal citations omitted).

### III. APPLICABLE LAW AND ANALYSIS

The Court will address Dr. Hausknecht and Dr. Carfi's expert testimonies in turn.

A.  Dr. Hausknecht

1.  Qualifications

Dr. Hausknecht is a board-certified neurologist, Diplomate of the American Board of Quality Assurance and Utilization Review Physicians, and Fellow of the American College of Medical Quality. (Docket No. 121-1). Defendants do not challenge Dr. Hausknecht's academic and professional background. Thus, the Court finds that he is qualified to testify in this medical malpractice case and assist the tier of fact.

Civil. No. 20-cv-01431(GMM)
Page -16-

  2. <u>Dr. Hausknecht's Expert Report</u>

  Dr. Hausknecht rendered his expert report on October 24, 2020. (Docket No. 121-1). Dr. Hausknecht indicates that his opinion and conclusions are based on his review of the following:

- the medical records of Doctors Center for AMS from 10/24/2016 through 10/26/2016, birth admission records from 10/27/2016 through 11/04/2016 hyperbilirubinemia;

- the medical records of Doctors Center for Ms. Soto-González from 10/24/2016 through 10/26/2016;

- labor and delivery records for AMS;

- information from: First medical health plan (The Pediatric Center of Arecibo), the Department of Health Division of Children with special medical needs, the Barceloneta Primary Heath Center, the Instituto Rehabilitation Caribe, the Manati Audiology and Balance Center, the Atlantic Medical Center, and Dr. Edwin Rosario Martinez;

- the Bill of Particulars and complaint and the report; and
- the report of Dr. Crawford.

  Dr. Hausknecht acknowledges in his report that he has not reviewed AMS's MRI or CAT scan of the brain. However, he indicates that he can identify the "list of deficiencies that the patient has had, which anatomically represent the physical findings the patient finds." (Docket No. 121-1 at 8).

  First, Dr. Hausknecht states in his report that "as a neurologist [his] main concern in this matter is to describe the damages, deficiencies, and ravages of kernicterus." Yet, he does

not discuss or provide an independent analysis of AMS's
kernicterus. On the contrary, Dr. Hausknecht's report generally
summarizes Dr. Crawford's report and states that he agrees with
her findings and opinions. (Docket No. 121-1 at 3-7). The Court
only identified a few paragraphs in the nine-page report containing
Dr. Hausknecht's independent analysis. Specifically, Dr.
Hausknecht makes the following conclusions:

> Sometimes one must follow simple rules. If something
> looks yellow, acts yellow, and actually is yellow, one
> must believe that it is yellow. We have a situation in
> this matter in which a newborn is hospitalized, the
> mother is complaining about the fact that the child
> appears yellow. The mother has reason to believe this,
> especially because the same thing had happened to one of
> her previous children, but apparently nobody, none of
> the nurses or other doctors or other personnel in the
> hospital are willing to believe her and discharge her.
> She shortly returns with a dramatically high level of
> bilirubin only a few hours after her discharge. This is
> almost difficult to believe had it not occurred. To
> describe this occurrence as unacceptable and not in
> keeping with any standard of care, although true is
> actually only the beginning of the departures from
> standard of care and mistakes made by the professionals
> treating Amaia.
>
> Even after it was incontrovertible that the bilirubin
> levels were markedly dangerously high, the various
> treatments available, as described by Dr. Crawford,
> including "double phytotherapy," exchange transfusion
> and other procedures, observation in an intensive care
> unit, appropriate consultations and laboratory tests did
> not occur in a timely fashion. Blood tests were either
> delayed or not implemented at all. There can be no excuse

Civil. No. 20-cv-01431(GMM)
Page -18-

> for these egregious departures from the standard of
> care.

(Docket No. 121-1 at 9). Furthermore, Dr. Hausknecht closes his

report by concluding:

> Having thus opined possibly I have to emphasize my
> original decision of how was it even possible that the
> child was discharged in the first place and reviewing
> the second hospital admission, when there could be no
> doubt of the dangerous levels of bilirubin, the delay in
> getting tests, getting consults, getting lab values, and
> treating the patient appropriately with the proper form
> and type of phytotherapy and possible exchange
> transfusions were never accomplished.
>
> The mistake made by the professionals as described in
> the Bill of Particulars and in Dr. Crawford's report
> definitely in my opinion, accounted for the
> neurologically detailed damages, were egregious and
> difficult to believe.
>
> The described damages are permanent and this child will
> require multiple medical professionals treatment 24
> hours a day for the remainder of her life.

(Id.). As can be noted, Dr. Hausknecht generally discusses the

alleged departures from the standard of care. He concludes that

the occurrence in this case is "unacceptable and not in keeping

with any standard of care, although true is actually only the

beginning of the departures from standard of care and mistakes

made by the professionals treating [AMS]" and that "[t]he mistake

made by the professionals as described in the Bill of Particulars

and in Dr. Crawford's report definitely in my opinion, accounted

for the neurologically detailed damages. . ." (Id.). Yet, he does

not identify the specific standards of care to which he is

Case 3:20-cv-01431-GMM  Document 176  Filed 02/23/24  Page 19 of 29

Civil. No. 20-cv-01431(GMM)
Page -19-

referring. Further, his broad conclusion does not indicate how the same were breached by each of the Defendants that intervened in the treatment of AMS, particularly Doctors Center, Dr. Díaz-Colón and Dr. Acosta-Montijo.

While the case law of the First Circuit and this District support the finding that a doctor testifying as an expert witness may sometimes imply a standard of care in their testimony without articulating the "magic words," this is not the case. *See* Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 190 (1st Cir. 1997) (holding that references to a "prevailing medical standard" used by the "average gynecologist" was sufficient to establish a standard of care). In this case, Dr. Hausknecht's report made no such statements that would allow the Court to reach a similar conclusion. Dr. Hausknecht's report identifies no national standard of care against which the trier of fact could measure those Defendants' purportedly negligent acts or omissions. Further, experts must prove that a standard of care is nationally used, rather than simply explaining a standard as based on their experience. They can do so by referencing "a published standard, [discussion] of the described course of treatment with practitioners outside the District. . .at seminars or conventions, or through presentation of relevant data." Strickland, 899 A.2d at 773-74. No such reference was made here either. Moreover, the report does not provide any data to sustain or explain the

Civil. No. 20-cv-01431(GMM)
Page -20-

conclusory finding that there was a deviation from the standard of care.

In addition, there is also no other basis in the record for concluding by a preponderance of the evidence that Dr. Hausknecht's opinion that Dr. Díaz-Colón and Dr. Acosta-Montijo acted negligently is "the product of reliable principles and methods." *See* Fed. R. Evid. 702(c). As recently decided by the First Circuit in Hosp. San Cristobal, Inc., his conclusion could "only be construed as one based on a res ipsa loquitur inference, an inference insufficient to withstand scrutiny in this setting." Hosp. San Cristobal, Inc., 91 F.4th at 72. (*citing* López-Ramírez v. Grupo Hima San Pablo, Inc., Civ. No. 16-3192 (RAM), 2020 WL 365554, at *5 (D.P.R. Jan. 22, 2020), aff'd López-Ramírez, 32 F.4th 87 ("[I]n the context of determining the admissibility of expert testimony, proffered testimony that consists solely of a res ipsa loquitur opinion would lack the reliable methodology and specialized information required by Fed. R. Evid. 702.")).

To further illustrate the deficiencies in Dr. Hausknecht's report, the Court compared the facts in the instant case to those in López-Ramírez, 32 F.4th at 87. In López-Ramírez, the First Circuit affirmed the District Court's ruling striking an expert's report and proffered testimony because, among other things, the report failed to explain the basis for the expert's conclusion that there was a deviation from the standard of care, and, instead,

Civil. No. 20-cv-01431(GMM)
Page -21-

contained only conclusory statements that the defendant surgeon failed to adhere to the applicable standard.

In this case, Dr. Hausknecht's expert report does not fare any better. Dr. Hausknecht failed to describe the principles or methods by which he reached his opinion, and his conclusions are broad and conclusory. Additionally, he does not delineate a standard of care applicable to Defendants, much less explain the basis for his conclusions that defendants deviated from such standard. Therefore, the Court finds there is a significant analytical gap between the content of the report and the opinions proffered. The report and its conclusions simply do not rest on reliable scientific methodologies or grounds.

What is more, Dr. Hausknecht's expert testimony heavily relies on Dr. Crawford's report. Although an expert may rely on other witnesses' testimony or other expert's conclusions to form an opinion, an expert cannot merely reiterate, vouch for, or bolster the opinions of someone else. *See* Iconics, Inc. v. Massaro, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) (*citing* Thorndike v. DaimlerChrysler Corp., 266 F.Supp.2d 172, 185 (D. Me. 2003)); *see also* Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir. 1995) (excluding expert testimony because it impermissibly bolstered the credibility of a witness, which resulted in the jury essentially surrendering "their own common sense in weighing testimony. . ."); Food, Inc. v. Indus. Risk Insurers, No. 5:13-CV-05204, 2015 WL

Civil. No. 20-cv-01431(GMM)
Page -22-

12914256, at *2 (W.D. Ark. Oct. 6, 2015) (holding that expert could not offer opinions "which serve no purpose other than to 'bolster' [another expert]'s opinions").

Since Dr. Hausknecht's testimony would not assist the trier of fact with regards to identifying, let alone understanding, the applicable standard of care and any deviation from it by Defendants, the Court **GRANTS** the *Motion to Exclude Dr. Hausknecht*.

B.   Dr. Carfi

1.   Qualifications

Although Defendants do not question Dr. Carfi's qualifications to serve as an expert witness, the Court notes that he is an Assistant Clinical Professor at the Department of Rehabilitation Medicine and Human Performance at Mount Sinai Medical Center. (Docket No. 122-1 at 6). Since his academic and professional background is not contested, the Court finds that he is qualified to testify in this medical malpractice case and assist the tier of fact.

2.   Dr. Carfi's Expert Report

Dr. Carfi rendered his expert report on December 31, 2020. (Docket No. 121-2). Dr. Carfi indicated that his opinion and conclusions were based on his review of the following:

- medical records from Doctors Center;

- medical records from Dr. Edwin Rosado Martínez;

Civil. No. 20-cv-01431(GMM)
Page -23-

- medical records from Dr. Mayra Santiago;

- medical records from First Medical Health Plan, Inc.;

- medical records from Dr. Eduardo Ramos;

- medical records from Long Island Jewish Medical Center;

- medical records from Northwell Health Children's Pediatrics;

- medical records from Dr. James Markowitz;

- an interview with Ms. Soto-González; and

- an examination of AMS.

(Docket No. 122-1 at 1).

Foremost, and Plaintiff admits as much, Dr. Carfi will only testify as a Life Care Planner, and not as to the applicable medical standards of care; the departures from the medical standards of care by Defendants in the treatment of AMS; or the causal relationship between the departure from the medical standards of care with AMS's damages. To that extent, in his report, Dr. Carfi references the pediatric admission history and a summary of the different evaluations performed by AMS's treating physicians. (Id. at 1-4). Then, Dr. Carfi identifies various medical and treatment recommendations that have been made by AMS's treating physicians: 1) Dr. Edwin Rosado Martínez referred AMS to pediatric neurology, physical medicine and rehabilitation, audiology, ophthalmology, and the early stimulation center; 2) Dr.

Eduardo Ramos opined that she needed a seating system, recommended Botox, and prescribed three 100 unit vials to be injected for spasticity; 3) Long Island Jewish Medical Center recommended clinical follow up regarding her poor development and global developmental delay; and 4) Northwell Health Children's Pediatrics made various recommendations including "physical, occupational, and speech therapies, wrist splints, baclofen, consider Botox and alcohol injections, brain MRI, modified barium swallow, GI consultation for G-tube, and x-rays," "neurology, ENT, PM&R, Early Intervention, and Laboratories," "Botox injections with the MRI sedation," and "a nutritional consult, consider supplemental non-oral means, a modified barium swallow study, as well as initiating feeding and swallowing therapy through Early Intervention."

Dr. Carfi goes on to include his clinical examination of AMS and summarizes the resulting impressions regarding AMS's physical examination. Thereafter, he includes his opinion that based on the medical records, history, and physical examination, AMS is

> in a completely dependent state having no prospects of living alone and will remain dependent upon others for her care and sustenance. She will never be employable. Her condition is permanent. Based upon my knowledge, training and experience in Physical Medicine and Rehabilitation as well as Life Care Planning, I have devised a proposed Life Care Plan for this child appended to this narrative."

(Docket No. 122-1 at 6).

Although Defendants allege that Dr. Carfi does not rely on or provide a medical recommendation for specific services, equipment, or treatment that he claims AMS will require, the above summary shows otherwise. Defendants also contend that Dr. Carfi's report does not specify what methodology he is utilizing. Yet, the Court notes that in the first few pages if his report, Dr. Carfi employed the standard methodology applied by life care planners which requires consideration of: (a) available medical records; (b) assessment of the individual; (c) assessment of the data and the individual's needs, and (d) research of the costs within the relevant geographical area of items needed for the proper care of the patient. This appears to be a sufficiently reasonable and reliable method for formulating a life-care plan. *See* <u>Marcano Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 171 (1st Cir. 2005) (holding that a district court did not abuse its discretion in admitting testimony from a life-care expert which was "based on a review of records from the agency providing her with skilled nursing care, a letter from her physician, and an interview of Fabiola's family and caregiver.").

In addition, Defendants argue that Dr. Carfi's life care plan does not estimate AMS's life expectancy. Plaintiffs respond that although Dr. Carfi is qualified to make such a calculation, there is no legal obligation to do so. The Court agrees that the lack of

this calculation is not enough to preclude Dr. Carfi's testimony.

As the First Circuit recently stated:

> Doctors' Center offers no authority demonstrating that it is clearly the case under Puerto Rico law that a plaintiff must present expert testimony about life expectancy to receive damages for future care costs in a medical malpractice action. Although we agree with the district court that presenting expert testimony about life expectancy is the best practice in a medical malpractice case involving an uncommon and severe medical condition and a request for future costs, we can find no authority clearly establishing that such expert testimony is necessary to recover damages for future care costs as a matter of law in Puerto Rico.

Rodriguez-Valentin v. Doctors' Ctr. Hosp. (Manati), Inc., 27 F.4th 14, 24 (1st Cir. 2022).

In sum, Defendants seem to argue that Dr. Carfi's assessment of AMS's needs are speculative and unsupported. Under the circumstances, that is a proper ground for cross-examination, but not a reason to exclude the testimony. The jury will afford the pertinent weight to his testimony.

Therefore, the Court **DENIES** Defendants' *Motion to Exclude Dr. Carfi*.

As to Defendants' *Supplement to Motion in Limine*, they argue that the Court should strike Dr. Carfi's "updated report" which was dated February 6, 2024 and submitted on February 12, 2024, because it was untimely. (Docket No. 137 at 1). Plaintiff, on the other hand, argues that Defendants have mischaracterized a "note

Civil. No. 20-cv-01431(GMM)
Page -27-

to file" as an "updated report." The "note to file" reads as follows:

**PRESENT HISTORY:**

[AMS] is now 7 years old, to be 8 years old this year. She continues to live at home with her mother, 17-year-old sister, and 10-year-old brother. [AMS] continues to be carried up and down stairs. Ms. Soto remains unemployed, caring for her children. She has a driver's license and a vehicle. Since I last saw her, [AMS] has been getting home-schooled through the school district. She is not receiving therapy services. [AMS] remains completely dependent with all activities of daily living. Her diet is unchanged, continuing to be pureed food by bottle. She continues to become very excited when she sees the bottle, spastic, and clamping her mouth. She remains not toilet trained, requiring 7 diapers a day. She continues to have no independent sitting balance, requiring full support. She still does not have a wheelchair, with Ms. Soto indicating that the school district is working on that. She does not crawl or have other floor mobility. Communication continues by vocalizations and facial expressions. She follows no requests. Playtime is as previously described. Ms. Soto has been told that her daughter has permanent severe hearing loss. Music remains not an attraction. She continues to get Botox injections every 3 months as previously reported. An additional medication has been prescribed for her spasticity, but Ms. Soto does not recall the name.

**OPINION:**

Based upon the Zoom interview, it is clear that [AMS's] condition is overall unchanged, and her needs are unchanged. I reviewed the Life Care Plan which I authored in 2020. This remains accurate in its content.

It is clear that once an expert "disclosure is made, it must be kept current. . .Since an important object of these rules is to avoid trial by ambush, the district court typically sets temporal parameters for the production of such information." Macaulay v.

Civil. No. 20-cv-01431(GMM)
Page -28-

*Anas*, 321 F.3d 45, 50 (1st Cir. 2003). Yet, after reviewing the content of the "note to file" or "updated report," regardless of how it is characterized and even assuming *arguendo* that it is untimely under Rule 26(e) standards, the Court must deny the motion to strike. Federal Rule of Civil Procedure 37(c)(1) provides that a party may not use supplemental information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure [to timely supplement] was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Furthermore, Rule 26(e) requires supplementation when a "party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"

Defendants have failed to show that the delay caused prejudice. The "note to file" is simply an "update" resulting from Dr. Carfi's re-interview of Plaintiff before the upcoming trial. Yet, the new information provided does not include a new theory or new evidence that is surprising to Defendants. Therefore, the Court concludes that the "update" to Dr. Carfi's report is harmless and can be allowed.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' *Motion to Exclude Dr. Hausknecht* (Docket No. 121); **DENIES**

**Civil. No. 20-cv-01431(GMM)**
**Page -29-**

Defendants' *Motion to Exclude Dr. Carfi* (Docket No. 122) and **DENIES**

the *Supplement to Motion in Limine* (Docket No. 137).


    IT IS SO ORDERED.

    In San Juan, Puerto Rico, February 23, 2024.


                            s/Gina R. Méndez-Miró
                            GINA R. MÉNDEZ-MIRÓ
                            UNITED STATES DISTRICT JUDGE